722 P.2d 662

Jimmy **FIERRO**,
Plaintiff-Appellee/Cross-Appellant,

v.

**STANLEY'S HARDWARE** and **Sentry Claims Service, Defendants-Appellees,**

and

Vincente B. **Jasso**, State Superintendent of Insurance, and the New Mexico Subsequent Injury Fund, Defendants-Appellants.

Nos. 7908, 7934.

Court of Appeals of New Mexico.

June 17, 1986.

Albert J. Rivera, Alamogordo, for plaintiff-appellee/cross-appellant.

Gregory W. Chase, Alice Tomlinson-Lorenz, Miller, Stratvert, Torgerson & Brandt, P.A., Albuquerque, for defendants-appellees.

Lisa K. Durrett, Charles W. Durrett, Durrett, Jordon & Grisham, P.C., Alamogordo, for defendants-appellants.

## OPINION

HENDLEY, Chief Judge.

The Supreme Court reversed our decision in *Fierro v. Stanley's Hardware*, 24 SBB 1022 (Ct.App.1985), and remanded the matter to us for determination of an issue that had been raised on certiorari. *Fierro v. Stanley's Hardware*, 104 N.M. 50, 716 P.2d 241 (1986). Several other issues had been raised in the case which we had ruled moot in light of our disposition. Because of the Supreme Court's reversal of our opinion, these issues are again viable.

This case involves a plaintiff who had a congenital defect in one eye and then sustained a work-related accidental injury to his other eye. The trial court entered judgment in plaintiff's favor against Stanley's, its carrier, and the New Mexico Subsequent Injury Fund. The Fund and plaintiff appealed.

Unless otherwise indicated, all references to the Workmen's Compensation Act (Act) shall be to NMSA 1978, Sections 52–1–1 to –69 (Orig.Pamp. and Cum.Supp.1985), and all references to the Subsequent Injury Act (SIA) shall be to NMSA 1978, Sections 52–2–1 to –13.

The Fund raised the following issues on appeal: (1) Did the employer have sufficient actual knowledge of plaintiff's preexisting impairment to allow recovery where the certificate of preexisting physical impairment was filed after the subsequent injury? (2) Does the SIA apply when plaintiff has a congenital impairment? (3) Do the limitations of the scheduled member section of the Act apply to the SIA, and if so, how? (4) Did the trial court correctly apportion liability between the employer and the Fund?

The plaintiff raised the following issues in his appeal: (1) Does substantial evidence support the trial court's finding that plaintiff sustained a 75% permanent partial disability as a result of the accidental injury to his left eye? (2) Did the trial court err in refusing to allow a clinical psychologist to give an opinion on the causal connection between the accidental injury and a claimed psychological disability, and, as a sub-issue, should a continuance have been granted so that a psychiatrist could be found to testify?

Our prior opinion addressed the Fund's certificate issue and the plaintiff's psychologist issue. We held that, because Stanley's did not have actual knowledge of the prior impairment and plaintiff did not timely file his certificate, the SIA did not apply and the Fund could not be held liable. Thus, the Fund's issues (2) through (4), and plaintiff's issue (1) became moot. Under our prior decision, plaintiff was limited to compensation from his employer only, and that compensation had to be in the form of scheduled benefits. We also held against plaintiff on his issue (2).

On certiorari, the Supreme Court reversed our decision on the Fund's issue (1), holding that plaintiff's certificate was in compliance with the SIA, and that there was sufficient evidence to support the trial court's finding of actual knowledge on the part of plaintiff's employer. The Supreme Court did not limit plaintiff's recovery to the scheduled benefits section and remanded that issue to this Court for decision. Due to the Supreme Court's decision reinstating the liability of the Fund, the Fund's issues (2) through (4) and plaintiff's issue (1) are no longer moot.

Accordingly, we address: I. Whether the SIA applies to congenital defects; II. Whether the limitations in the scheduled member section of the Act apply to the SIA; III. Whether the trial court correctly apportioned liability; and, IV. Whether substantial evidence supports the trial court's finding of 75% disability. We affirm.

**I**

The Fund maintains that the SIA only applies to subsequent injuries which are preceded by an accidental injury and not to subsequent injuries which are preceded by other impairments, including congenital impairments. We disagree.

Although Sections 52–2–2(A) and 52–2–6 do refer to "injuries" and "accidental injuries," Sections 52–2–3 and 52–2–9(A) refer simply to "permanent physical impairment." These are defined as permanent physical conditions which are in fact, or are likely to be, obstacles to employment. Thus, the provisions of Sections 52–2–2(A) and –6 appear to conflict with Sections 52–2–3 and –9(A).

When an ambiguity appears in statutory language which gives rise to several different interpretations, we resort to construction and interpretation to arrive at the statutory meaning. *Vaughn v. United Nucle-*

*ar Corp.,* 98 N.M. 481, 650 P.2d 3 (Ct.App. 1982). Our task is to ascertain the legislative intent.

*Vaughn* notes that the SIA is remedial, should not be interpreted narrowly or technically, and should be construed in light of its beneficent purposes. The intention behind the SIA is to encourage employment and retention of handicapped employees by employers. It should be liberally construed to effectuate the purpose of encouraging employment of the handicapped. It would be contrary to *Vaughn* to apply the SIA so that subsequent injuries which were preceded by congenital permanent physical impairments were excluded.

The Fund's argument that the Legislature intended to distinguish between two types of handicapped workers is not in accord with *Gutierrez v. City of Gallup,* 102 N.M. 647, 699 P.2d 120 (Ct.App.1984). There, the issue was whether the Fund was liable when a third-party tortfeasor was responsible for plaintiff's prior impairment, and the worker had settled with the tortfeasor. We stated:

> The result the Fund seeks would discriminate between two classes of handicapped workers, those who availed themselves of the workmen's compensation remedy for an earlier injury and those, equally physically impaired, who did not. We can discern no policy goal which would support such discrimination.

*See also* Larson's criticism of *McLean's Case,* 326 Mass. 72, 93 N.E.2d 233 (1950), at 2 A. Larson, *The Law of Workmen's Compensation* § 59.32(a) (1983), and *Lawson v. Suwannee Fruit & Steamship Co.,* 336 U.S. 198, 69 S.Ct. 503, 93 L.Ed. 611 (1949).

■ The Fund advances no convincing justification for the disparate treatment of those handicapped through accidental injury and those handicapped by congenital defects. We find it significant that the Legislature did not define "injury" in the SIA, but did define "permanent physical impairment" broadly. It includes all suffering from a permanent impairment which is, or is likely to be, an obstacle to employ-

ment. § 52–23. If the SIA had consistently used the term "injury," the Fund might have had an argument, but since the SIA is ambiguous, and we can see no justification for discriminating between classes of handicapped workers, we interpret it to include congenital defects.

## II

Section 52–2–12 states, "The payments prescribed by this Subsequent Injury Act shall be subject to the same limitations, in time and in amount, as those under the Workmen's Compensation Act...." The question raised here is whether the following language found in Section 52–1–43(D) qualifies as "limitations, in time and in amount" under Section 52–2–12, which would prevent application of the SIA:

> The loss of ... both eyes ... constitutes total disability ... provided, the employer shall not be liable for compensation for total disability if the loss of one ... eye occurred before the accidental injury for which claim is made, but in that event compensation shall be paid only in accordance with the schedule set forth in Subsection A of this section.

The application of Section 52–1–43(D). to this plaintiff would mean that he could not recover under the SIA. Nor would the SIA apply to any worker previously handicapped by the loss of one arm, foot, leg, or eye, who subsequently lost the other such member. Application of the limitations in Section 52–1–43(D) to the Fund would preclude the trial court from determining that plaintiff had a "combined condition of disability," pursuant to Section 52–2–11(F). Plaintiff would be limited to the one eye covered by Section 52–1–43(D).

The Fund's argument is absurd and illogical. It was precisely for cases such as this that the subsequent injury fund was created. *See Fierro v. Stanley's Hardware,* 24 SBB 1022 at n. 1. Section 52–1–43(D) was enacted two years before the SIA to encourage employers to hire the handicapped by restricting their liability to scheduled injuries resulting from on-the-job accidents. *See* 2 A. Larson, *supra,* §§ 59.-

20 and 59.21. The result was harsh for individual employees. In those days, if a second injury, combined with a prior impairment, produced total disability, an employee was left destitute because he could be compensated only for the subsequent injury.

States adopted subsequent injury acts to deal with the dissatisfaction caused by statutes like Section 52–1–43(D). 2 A. Larson, *supra*, § 59.31(a); *Reynolds v. Ruidoso Racing Ass'n*, 69 N.M. 248, 365 P.2d 671 (1961) (Justice Moise discussing the purpose of subsequent injury funds and urging the Legislature to adopt one). Under subsequent injury legislation, the employer's liability remains limited, but the worker benefits because the additional amount due because of plaintiff's combined condition of disability is paid to him by the Fund. Under the old system, this additional amount was not paid at all.

The Fund's argument would leave employees with the same harsh result as under the old apportionment scheme. The Fund's argument is contrary to the whole scheme of the SIA. When the Legislature enacts a new law, it is presumed that the Legislature intended to change the law. *State ex rel. Bird v. Apodaca*, 91 N.M. 279, 573 P.2d 213 (1977). Although Section 52–1–43(D) would appear to be a "limitation" on what plaintiff can recover, we cannot adhere to the literal use of words when it would lead to injustice, absurdity, or contradiction. *State v. Nance*, 77 N.M. 39, 419 P.2d 242 (1966).

 We construe the "limitations, in time and in amount" language in Section 52–2–12 to refer to the limitations found in Sections 52–1–20 (average weekly wage) and 52–1–47 (600 weeks) and similar sections, and not to refer to the limitations found in Section 52–1–43(D). Otherwise, we would be faced with an anomolous situation in which a worker having a previous back injury and then a subsequent back injury would be fully compensated, but a worker having a previous eye injury and then a subsequent eye injury would not be fully compensated. We do not believe that the Legislature intended such a result. *Cf. Lawson; Gutierrez*. The limitation provided in Section 52–1–43(D) cannot be used to insulate the Fund from liability in this case.

### III

The trial court entered judgment as follows: Stanley's was ordered to pay all benefits due in the first eight weeks. For the remainder of the healing period, 39 weeks, plaintiff was awarded total disability benefits which would be payable 20% by Stanley's and 80% by the Fund. Thereafter, Stanley's was to pay 75% benefits for 120 weeks, and the Fund was to pay 75% benefits for the remaining 433 weeks. Medical expenses, vocational rehabilitation benefits, costs, and attorney fees were awarded. These were apportioned 20% to Stanley's and 80% to the Fund.

Thus, the trial court limited the employer's liability to the number of weeks allowed under the scheduled injury section, which is what it would have been responsible for had plaintiff not had a previous impairment. The trial court alternatively ruled that, if the scheduled injury section did not apply to limit the employer's liability, then all compensation would be apportioned so that the employer would pay 20% and the Fund would pay 80%.

 The Fund makes several arguments here. First, the Fund attacks the alternative portion of the judgment. Because we have decided that the scheduled injury section does apply to the employer's portion of the liability, the Fund was correctly required to pay the difference between this amount and the amount payable for the combined condition of disability. Therefore, the Fund's argument against the alternative portion of the judgment need not be addressed.

The Fund also claims that the award was in error with respect to the Fund's apportioned liability for medical expenses, vocational rehabilitation benefits, attorney fees, and costs. We do not reach this issue because the Fund's docketing statement

did not raise it. *State v. Vogenthaler*, 89 N.M. 150, 548 P.2d 112 (Ct.App.1976).

 Finally, the Fund claims that there was no evidence to support the award of vocational rehabilitation benefits, and that it should be reversed because the trial court did not expressly find a need for such benefits. We do not reach the first aspect of this claim because it was not properly brought to the trial court's attention. *See Citty v. Citty*, 86 N.M. 345, 524 P.2d 517 (1974); *McLam v. McLam*, 85 N.M. 196, 510 P.2d 914 (1973); *Hall v. Lea County Electric Cooperative*, 78 N.M. 792, 438 P.2d 632 (1968). With regard to the second aspect, there was evidence regarding plaintiff's need for vocational rehabilitation, and the trial court's award of such benefits implicitly recognizes this. Indeed, given the evidence in this case, the trial court would have erred in *not* awarding vocational rehabilitation benefits based on need. *Ruiz v. City of Albuquerque*, 91 N.M. 526, 577 P.2d 424 (Ct.App.1978).

### IV

Plaintiff claims that the trial court's award of 75% permanent partial disability after the healing period is not supported by substantial evidence. He claims that "[t]he evidence supports a finding of 100% permanent disability." It is irrelevant that the evidence would have supported a finding of total disability. As we stated in *Hernandez v. Mead Foods, Inc.*, 104 N.M. 67, 716 P.2d 645 (Ct.App.1986), "The question is not whether substantial evidence would have supported an opposite result; it is whether such evidence supports the result reached." *See also Bagwell v. Shady Grove Truck Stop*, 104 N.M. 14, 715 P.2d 462 (Ct.App.1986). Thus, we must determine whether any evidence supports the trial court's determination that plaintiff was not totally disabled.

 The evidence was that, once plaintiff injured his eye in the work-related accident, the sight in his other eye, formerly his only bad eye, began to improve. The doctors testified that, although plaintiff was severely visually impaired, there were things that he might be able to do. The doctors indicated that plaintiff could be a dishwasher, a job within his former employment history. Although there was evidence to the contrary, we review the evidence in the light most favorable to support the judgment. *Bagwell.* The evidence supported the trial court's judgment.

The trial court is affirmed. Plaintiff is awarded attorney fees in the amount of $1,500 for the services of his attorney in this Court and in the Supreme Court. The Fund shall pay these fees. No part of the fee award is for the services of plaintiff's counsel in pursuing plaintiff's own appeal because it was rejected both in this opinion and in our prior opinion.

IT IS SO ORDERED.

DONNELLY and ALARID, JJ., concur.